FRANK T. INNES, PLAINTIFF–APPELLANT, v. NITA L. INNES, DEFENDANT–RESPONDENT.

Argued April 24, 1989—Decided January 17, 1990.

*James J. Byrnes* argued the cause for appellant (*Byrnes & Guidera,* attorneys).

*John A. Craner* argued the cause for respondent (*Libby E. Sachar,* attorney; *Norman W. Albert,* of counsel; *Libby E. Sachar, Norman W. Albert,* and *John A. Craner,* on the briefs).

*James P. Yudes* submitted a brief on behalf of *amici curiae* Family Law Section and Women's Rights Section of the New Jersey State Bar Association.

The opinion of the Court was delivered by

GARIBALDI, J.

We hold today that payments generated by pension benefits that were previously equitably distributed are not "income" for purposes of reconsidering the pensioner's alimony obligations. Our decision is based on the recent amendment to *N.J.S.A.* 2A:34–23, the pre-existing case law and the specific language of the parties' agreement.

After thirty-one years of marriage, Frank T. Innes, plaintiff, filed a complaint for divorce on October 8, 1982. The ground for the complaint was the continuous separation of Innes and his wife-defendant, Nita L. Innes, since June 2, 1974. A Dual Judgment of Divorce was entered on March 26, 1984. The judgment incorporated the terms of a property-settlement agreement reached between the parties.

The agreement required plaintiff to pay defendant $650 per month in alimony and $100 in child support directly to the unemancipated daughter of the marriage. Three other children born of the marriage were emancipated at the time of the divorce. Plaintiff also agreed to maintain defendant as beneficiary on a life-insurance policy with a face amount of $50,-000.00.

The agreement also disposed of the parties' two major assets, the marital home and the husband's pension. Defendant could live in the former marital residence until March 1, 1985, when the house would be sold and the net proceeds divided equally between the parties. Plaintiff agreed to pay defendant an equitable (distribution) share of his pension, $19,000, less forty percent of the value of the defendant's existing pension. Plaintiff was to pay defendant this money from the proceeds of the sale of the marital home. The agreement also contained a

provision that stated: "Except as otherwise set forth herein each of the parties hereby waives and relinquishes all rights to participate in the assets including pension funds of the other party."

The marital home was sold in 1985; the plaintiff received $39,028.70 and defendant received $74,042.52. The difference between the amounts, $35,000.00, is attributable to the cash settlement paid to defendant representing the value of the plaintiff's pension plan.

On June 14, 1985, the plaintiff was unexpectedly fired by his employer. He was sixty-one years of age at the time of his termination. His monthly income was reduced from $2,054 to $879, which he received in unemployment compensation. After his discharge plaintiff made every effort to find new employment but was unable to do so.

Unable to procure a new position, plaintiff filed a motion for an order terminating alimony on June 28, 1985. Defendant filed a Notice of Motion for Aid to Litigant on December 4, 1985, based on plaintiff's failure to pay alimony pursuant to the divorce decree. On December 31, 1985, the trial court denied the motion to terminate alimony but entered an order finding that plaintiff had failed to comply with the divorce judgment. Plaintiff appealed both orders, and on May 7, 1986, the case was remanded to the trial court for reconsideration because plaintiff asserted a change in circumstances after the entry of the two orders.

In December 1985, when his unemployment benefits ceased, the plaintiff elected to receive social-security benefits of $622 per month. In April 1986 the plaintiff elected to receive his pension benefits. At that time he also purchased a $24,000 annuity from the College Retirement Equity Fund using the proceeds he had received from the sale of the marital home. The monthly income from the pension, $720.00, and the annuity, $160.00, totalled $880. He also received approximately $139.00 in income from other savings. He had assets of $19,580.

Defendant, who was disabled, had moved to Florida by the time of the hearing. She received monthly income from the University of Pennsylvania of $420.00, disability social-security benefits of $280.00, and approximately $400.00 per month from a cash management account. She had approximately $68,-000.00 in assets.

The trial court determined that plaintiff's termination of employment constituted a change in circumstances sufficient to result in a modification of the alimony award. Accordingly, the trial court reduced the alimony from $650 to $550 per month, beginning April 1, 1987, and required plaintiff to pay the defendant $100 per month toward the arrearage until it was paid in full, and $1,200 for defendant's counsel fees. In making its decision, the trial court considered the fact that the cost of living had increased, plaintiff's income had decreased, and plaintiff had paid $200 per month to his daughter while she was attending college.

Plaintiff appealed, contending that in determining alimony the trial court should not have considered the income he received from his pension and annuity. Including that income, he argued, constituted an inequitable form of "double-dipping," inasmuch as it flowed from assets that had already been equitably distributed. He relied on *D'Oro v. D'Oro*, 187 *N.J. Super.* 377 (Ch.Div.1982), *aff'd*, 193 *N.J.Super.* 385 (App.Div. 1984), which prohibits such consideration. The Appellate Division reversed and remanded, 225 *N.J.Super.* 242 (1988), because the trial court had made no findings concerning the parties' circumstances in establishing the alimony award. However, the Appellate Division rejected plaintiff's argument that his pension and annuity should not be considered in determining alimony. In its holding it specifically rejected the *D'Oro* rule. *Id.* at 247. Judge Long dissented from so much of the decision as held that pension and annuity payments were income for the purposes of determining alimony. *Id.* at 248–50. She found that

[p]laintiff and defendant divided the pot of marital assets at the time of the divorce. In so doing, defendant took her share of plaintiff's pension in a lump sum. Plaintiff now receives his share of the pension periodically. Periodicity does not change the nature of the transaction or the character of the pension payments as assets and not income. This is not a situation in which a distributed asset generates or throws off income. In that event, the income would clearly be a part of the post-judgment alimony base. Here, the pension payments sought to be tapped by defendant as alimony are plaintiff's equitable share of the marital asset; as such they are not includible in the calculation of available income for an alimony award. It is not the fact that the pension is not income. Simply stated, no asset, however derived, should be considered part of the income available for alimony purposes. [*Id.* at 248–49].

The recent amendment to *N.J.S.A.* 2A:34–23, which codifies the holding in *D'Oro,* had not been enacted when the Appellate Division decided the case. Accordingly, neither Appellate Division opinion discussed the applicability of the amendment to this case.

Plaintiff filed an appeal of right pursuant to *Rule* 2:2–1(a)(2).

I

In divorce actions, courts may award alimony "as the circumstances of the parties and the nature of the case shall render fit, reasonable and just ..." *N.J.S.A.* 2A:34–23. The basic purpose of alimony is the continuation of the standard of living enjoyed by the parties prior to their separation. *Mahoney v. Mahoney,* 91 *N.J.* 488, 501–02 (1982). The supporting spouse's obligation is set at a level that will maintain that standard. *Lepis v. Lepis,* 83 *N.J.* 139, 150 (1980). Although the supporting spouse's current income is the primary source considered in setting the amount of the award, his or her property, capital assets, and "capacity to earn the support awarded by diligent attention to his [or her] business" are also proper elements for consideration. *Bonanno v. Bonanno,* 4 *N.J.* 268, 275 (1950).

Plaintiff is applying for a modification of the initial alimony award due to changed circumstances. After initial alimony awards have been made, courts may modify alimony orders "as circumstances may require." *N.J.S.A.* 2A:34–23.

The party seeking modification has the burden of demonstrating a change in circumstances warranting relief from the support or maintenance obligations. *Lepis v. Lepis, supra,* 83 *N.J.* at 157; *Martindell v. Martindell,* 21 *N.J.* 341, 353 (1956). One "changed circumstance" that warrants modification of the alimony order is an increase or decrease in the supporting spouse's income. *Lepis v. Lepis, supra,* 83 *N.J.* at 151; *Martindell v. Martindell, supra,* 21 *N.J.* at 355.

■ When an alimony order is reviewed, the primary factors assessed to determine whether the former marital standard of living is being maintained are: "the dependent spouse's needs, that spouse's ability to contribute to the fulfillment of those needs, and the supporting spouse's ability to maintain the dependent spouse at the former standard." *Lepis v. Lepis, supra,* 83 *N.J.* at 152. Other criteria include whether the change in circumstance is likely to be continuing and whether the agreement or decree explicitly provided for the change. *Ibid.* Temporary circumstances are an insufficient basis for modification. *Bonanno v. Bonanno, supra,* 4 *N.J.* at 275 (temporary unemployment not sufficient).

## II

■ In this case we do not decide whether plaintiff's alimony payments should be modified. The modification of alimony is best left to the sound discretion of the trial court. Hence, we remand the case to the trial court to determine whether there were changed circumstances, and if so, whether there should be a modification of alimony. The issue before us is whether the trial court in determining whether plaintiff's alimony payments should be modified may consider plaintiff's pension payments.[1]

---

[1]At the request of the Court, the Family Law Section and Women's Rights Section of the New Jersey State Bar Association filed an *amicus curiae* brief. The brief concluded that the recent amendment applies to initial alimony awards as well as to applications for modification of alimony, that the amendment applies retroactively to agreements entered into before the effective date

We hold that it may not. Our disposition of this issue is governed by the recent amendment to *N.J.S.A.* 2A:34–23, pre-existing law, and the specific language of the parties' agreement. The amendment reads, in relevant part, as follows:

When a share of a retirement benefit is treated as an asset for purposes of equitable distribution, the court shall not consider income generated thereafter by that share for purposes of determining alimony. [*L.*1988, *c.* 153, § 3.]

It is axiomatic that in construing a statute one first considers its plain language. *Kimmelman v. Henkels & McCoy, Inc.*, 108 *N.J.* 123, 128 (1987); *Renz v. Penn Cent. Corp.*, 87 *N.J.* 437, 440 (1981); *Sheeran v. Nationwide Mut. Ins. Co., Inc.*, 80 *N.J.* 548, 556 (1979). The plain language of the pertinent amendment provides that income from pension benefits that have been treated as an asset for equitable distribution purposes (those benefits reflecting work during the marriage partnership) is not to be considered in determining alimony. Conversely, under the amendment income from pension benefits earned after the marital partnership has ended may be considered. This interpretation is substantiated by Senate Judiciary Committee, *Statement to Senate*, No. 976, which provides "that when a share of a retirement benefit is treated as an asset for purpose of equitable distribution, the income generated by that share *only* is not to be considered in determining alimony." (Emphasis added).

Although the legislative history underlying the amendment is sparse, the statute sets forth no new position and simply codifies and embodies the holding and policies of the decision in *D'Oro v. D'Oro, supra*, 187 *N.J.Super.* 377. There, consistent with *Kikkert v. Kikkert*, 177 *N.J.Super.* 471, 477–78 (App.Div), *aff'd o.b.*, 88 *N.J.* 4 (1981), a wife received a one-third share of the present value of her husband's pension. The *D'Oro* court

---

of the statute, that the amendment precludes consideration on alimony-modification applications of both income attributable to the distributed share of a retirement benefit and the distributed share itself; and that neither spouse's share of a distributed retirement benefit (or earnings attributable thereto) should be considered when determining alimony.

reasoned that "it would be inequitable for [her] to be able to include his pension income *twice* for her benefit, first for a share of equitable distribution, and second for inclusion in his cash flow determination of an alimony base." 187 *N.J.Super.* at 379; *accord Staver v. Staver,* 217 *N.J.Super.* 541, 547 (Ch.Div.1987) (portion of pension payments flowing from benefits earned after divorce may be considered in determining changed circumstances, but those attributable to benefits earned during the marriage and subject to equitable distribution may not).

The *D'Oro* holding also was based on the court's decision to promote the immediate-offset method of pension distribution. 187 *N.J.Super.* at 377. That method was encouraged in *Kikkert, supra,* 177 *N.J.Super.* at 478, to avoid the "continued strife and hostility" that arises from long-term and deferred sharing of financial interests. We recently reaffirmed that policy in *Moore v. Moore,* 114 *N.J.* 147, 162 (1989). As Judge Long acknowledged in her dissenting opinion in the instant case, the policy favoring the immediate offset method will be eviscerated if the majority opinion of the Appellate Division is adopted because

[m]ost thoughtful matrimonial lawyers will advise their clients in continuing alimony cases to await the receipt of the pension for distribution at which time both spouses will receive their share in periodic payments. This will obviate the possibility that the dependent spouse will tap the asset twice. * * * [Also], it will contravene the plain language of *Kikkert* encouraging such settlements. [225 *N.J.Super.* 242.]

■ Here plaintiff's entire pension was treated as an asset for purposes of an immediate offset equitable-distribution award. This distribution was consistent with *Moore v. Moore, supra,* 114 *N.J.* at 162, and *Kikkert v. Kikkert, supra,* 177 *N.J.Super.* at 477. Nothing in the record suggests that merely a portion of plaintiff's pension was considered marital property subject to equitable distribution. Therefore, the recent amendment immunizes plaintiff's pension from consideration in alimony-modification determinations.

This result is consistent with the legislative intent underlying the recent amendment. Although that specific amendment was first proposed in 1985, further amendments to *N.J.S.A.* 2A:34–23 and other modifications of New Jersey family and matrimonial law were addressed in the early 1980s by the New Jersey Commission on Sex Discrimination. In amending *N.J.S.A.* 2A:34–23, the Legislature relied to a great extent on the Commission's findings. In recommending amendments to New Jersey's marriage and family law, the Commission on Sex Discrimination in the Statutes stated that its two-fold purpose was to recommend appointment of more women to commissions, boards, and agencies, and to conform all statutes and regulations to a standard of sex-neutral language. *Sex Discrimination in Marriage and Family Law: New Jersey Commission on Sex Discrimination in the Statutes* (2d Report, Sept.1981) at i-ii. In the introduction, the Commission reported that it found the New Jersey marriage and family-law statutes "contained many subtle forms of discrimination reflecting stereotypical attitudes towards men's and women's roles." *Id.* at 2.

The recommended amendments support the Committee's expressed goal of neutralizing any language that supports sexual stereotypes. For example, *N.J.S.A.* 2A:34–13, the statute regarding the age at which a party can bring a matrimonial action, previously allowed a man of eighteen years and a woman of sixteen years to do so. The amended statute reads a "person" of sixteen years, eliminating the gender-based age requirement. *N.J.S.A.* 9:6–3 states that when a parent or guardian abuses a child, the abuser may be required to pay a monetary penalty to the wife, guardian, custodian, or trustee of the child. The recommended amendment would eliminate the silent assumption that the husband or father would normally be the abusing parent, and substituted "non-abusing parent" for "wife." The Commission also recommended changing *N.J.S.A.* 9:2–4, regarding parental rights to custody, to eliminate the mother's preference as custodial parent, and make custody rights completely equal between the parents.

Thus, the amendments proposed by the Commission were designed to remove discrimination against women and men, and to make the rights of mother and father, or wife and husband, equal in the eyes of the law. Similarly, the amendment at issue, designed to avoid double-dipping, reflects the Legislature's intent to follow the Commission's recommendation that husbands and wives be treated equally under the law.

■ In holding that the recent amendment applies to the instant case, we also hold that it is applicable to both initial alimony orders *and* modifications of earlier alimony awards. We find no support for the position of our dissenting colleagues that the amendment applies only to initial orders and not to modifications of alimony. The plain language of the amendment, the canons of statutory interpretation, and preexisting principles of matrimonial law undermine their contentions. Prior to the recent amendments to *N.J.S.A.* 2A:34–23, we stated that "[t]he equitable power of the courts to modify alimony and support orders at any time is specifically recognized by [that statute.]" *Lepis v. Lepis, supra,* 83 *N.J.* at 145. "As a result of this judicial authority, alimony and support orders define only the present obligations of the former spouses. Those duties are always subject to review and modification on a showing of 'changed circumstances.'" *Id.* at 146. We affirmed in *Gibbons v. Gibbons,* 86 *N.J.* 515, 525 (1981), the well-established principle that any orders pertaining to alimony or other support may be revised and altered by the Court from time to time as circumstances may require. We recognized both in *Lepis* and *Gibbons* that such authority flows from a section of *N.J.S.A.* 2A:34–23 (alimony "[o]rders so made may be revised and altered by the Court from time to time as circumstances may require...."). The Legislature's failure to remove or limit that provision when it recently amended *N.J.S.A.* 2A:34–23 confirms the Legislature's intent that the recent amendment applies not only to an initial alimony award but also to a modification of alimony based on changed circumstances.

Moreover, the plain language of the amendment states that it "takes effect on September 1, 1988, and shall apply only to orders and judgment entered after that date," and extends its reach to any order, including a modification of an original order that is entered after September 1, 1988. *L.*1988, *c.* 153, § 9. Indeed, a contrary conclusion would violate well-established canons of statutory interpretation: avoid constructions that render any part of a statute inoperative, superfluous, or meaningless, *Abbotts Dairies v. Armstrong,* 14 *N.J.* 319, 328 (1954); *Paper Mill Playhouse v. Millburn Township,* 95 *N.J.* 503, 521 (1984), or lead to absurd results, *State v. Gill,* 47 *N.J.* 441, 445 (1966). Given the nature of marriage, divorce, and aging in our society, parties usually obtain a divorce before they are retired and begin receiving pension benefits. Accordingly, disputes about pension income as it relates to alimony will almost always occur after the parties are divorced. More importantly, the statute is tailored to apply primarily where an immediate pay-out of the pension has been made before income is generated. The ill the statute is designed to remedy is *subsequent* consideration of income generated by that portion of the pension that had previously been considered for purposes of equitable distribution. Hence, the issue of double-dipping will most frequently occur in the context of an application for alimony modification rather than an initial alimony award.

Nor are we persuaded that the recent amendment should not apply to plaintiff's request for alimony modification because the final judgment of divorce and initial award of alimony were rendered prior to the amendment's enactment. As previously discussed *supra* at 503, such a finding would be inconsistent with the language of the amendment and the authority of the courts to constantly review and alter alimony awards as circumstances change. Our dissenting brethren would freeze the divorce agreement and provide that regardless of whether a newly-enacted statute is curative, merely reflective of preexisting law, or consistent with the expectations of the parties, the modification of alimony must be determined by law in effect at

the time the final judgment of divorce and initial award of alimony was entered.

Their contention is inconsistent with common-law principles governing retroactive application of legislation. *See Gibbons v. Gibbons, supra,* 86 *N.J.* at 522–25; *Rothman v. Rothman,* 65 *N.J.* 219 (1974). When *N.J.S.A.* 2A:34–23, the equitable-distribution statute, was enacted, one of the first questions this Court confronted was whether the statute was to be retroactively applied or applied only prospectively. In *Rothman v. Rothman,* 65 *N.J.* 219 (1974), we held that the statute was to be retroactively applied because that interpretation was necessary to make it workable and give it its most sensible interpretation. Specifically, in *Rothman v. Rothman, supra,* 65 *N.J.* at 223–24 (footnote omitted), we held:

> Momentarily ignoring constitutional compulsions, and viewing the issue simply as one of statutory construction, we find ourselves unable to believe that the Legislature intended its grant of power to undertake an equitable distribution of marital assets to apply solely to property acquired on or after the effective date of the act. Were this construction to be adopted, it would, in each case, become necessary to determine the date of acquisition of each asset acquired during marriage, often a difficult if not impossible task. A further question would arise should the particular property interest under consideration, though acquired after the effective date of the act, have been purchased with, or received in exchange for, money or other property owned before that date. Moreover, if defendant's contention were adopted, it has been estimated, apparently without exaggeration, that the full effect of the statute would not be felt for at least a generation.

To make this amendment workable and to give it its most sensible interpretation, it must be applied to modification of alimony orders that were entered prior to the effective date of the amendment. The dissents' proposed prospective application would result in a court in each case undertaking a painstaking review of the prior negotiations resulting in the initial alimony award and equitable-distribution settlement. Additionally, the full effect of this amendment would not be realized for a long period of time.

Moreover, *N.J.S.A.* 2A:34–23 as amended does not represent new law but is merely reflective of preexisting law. *Gibbons v.*

*Gibbons, supra,* 86 *N.J.* at 524. A review of the criteria listed in *N.J.S.A.* 2A:34–23 discloses that the statutory language merely sets forth the well-established guidelines that courts have understood and embraced for years in considering the needs and circumstances of the parties in determining appropriate alimony and equitable-distribution awards. *Commission on Sex Discrimination Report, supra,* at 26–27.

Additionally, the amendment also is consistent with the reasonable expectations of the parties. The test of expectation is whether the parties relied on prior law to their detriment, such that retroactive application would cause a "deleterious and irrevocable" result. *Gibbons v. Gibbons, supra,* 86 *N.J.* at 523–24. At the time the property-settlement agreement was incorporated in the dual judgment for divorce, both the *Kikkert* and *D'Oro* decisions had been rendered. Indeed, the parties followed those decisions. Defendant received in equitable distribution a lump-sum payment for plaintiff's pension, which they both recognized was an asset and to which defendant relinquished her right. That is clear from the language of their agreement: "Except as otherwise set forth herein each of the parties hereby waives and relinquishes all rights to participate *in the assets including pension funds of the other party.*" (Emphasis added).

The dissents' suggestion that the Legislature intended the double-dipping amendment not to apply to consensual property-settlement agreements but only to court decrees is equally unpersuasive. In *Lepis v. Lepis, supra,* 83 *N.J.* at 149, we specifically found that there is "no reason to distinguish between judicial decisions and consensual agreements when 'changed circumstances' call for the modification of either." Likewise, we see no reason why the unfair policy the Legislature intended to prohibit by the amendment is not equally applicable to consensual agreements and court decrees. Moreover, the distinction between the two is meaningless. Indeed, most parties negotiate the terms of a property-settlement

agreement, which is then incorporated in the divorce decree by the Court. Hence, most property-settlement agreements are voluntary and incorporated in a court decree.

Evidently, our dissenting brethren do not like the amendment and want the Court to alter the Legislature's enactment. Under Justice Stein's alteration, the double-dipping prohibition would be "presumptive" rather than a clear rule, *post*, at 534. This, however, is not the amendment the Legislature enacted. Moreover, such a proposal not only flies in the face of the plain meaning of the statute but it is vague, unworkable and creative of further complications in an already confused area of the law.

Applying the recent amendment codifying the pre-existing law is consistent with the Legislature's intent, the remedial policies underlying the pre-existing law at the time of its enactment, namely, avoiding "double-dipping" of retirement benefits and encouraging the immediate-payout method of retirement benefits, and the clearly-expressed expectations of the parties.[2]

---

[2]In *Horton v. Horton*, 219 *N.J.Super.* 76 (Ch.Div.1987), *D'Oro* was limited to its facts. The court found that *D'Oro* would apply only "[w]hen imminent retirement is anticipated and equitable distribution and alimony are bargained for, or, barring those factors, the parties *specifically* anticipate alimony adjustment on retirement (early or otherwise)...." *Id.* at 78. In the *Horton* property-settlement agreement, the fifty-five-year-old plaintiff had received his pension benefits and the defendant had received the marital home. One year later, the plaintiff retired and moved to eliminate his alimony obligation. *Id.* at 78. Because the parties had not considered imminent retirement, the *Horton* court found that the plaintiff's pension benefits could be included in reconsideration of alimony obligations. Emphasizing that the plaintiff had voluntarily accepted early retirement, thereby substantially reducing his income, the court held that the benefits could be included until the pensioner reached ordinary retirement age, which the court found to be "coincident to the eligible age for receiving Social Security benefits." *Id.* at 79. The recent amendment rejects *Horton* as well as the Appellate Division majority opinion in the case at bar and follows *D'Oro*. We need not address the question of whether the amendment should be retroactively applied to parties who crafted property-settlement agreements in reliance on the holding in *Horton* or, for that matter, the Appellate Division decision in the instant case. The parties in

## III

The final issue we must address involves the trial court's consideration of the annuity payments. The recent amendment concerning retirement benefits is not applicable to plaintiff's annuity. We agree with Judge Long's dissenting opinion and hold that such payments are not "income" for purposes of determining changed circumstances insofar as they reflect principal rather than "income generated by the $24,000 plaintiff received in distribution...." 225 *N.J.Super.* at 250. Had the plaintiff shoved the $24,000.00 in a friend's mattress and asked that friend to start sending him $200.00 a month, there is no question that those payments could not be considered "income" for purposes of altering an earlier alimony award. The same is true of the portion of the annuity payments that reflect return of the principal. On the other hand, income generated by the principal and given to the plaintiff on a monthly basis is "income" for purposes of determining "changed circumstances." That portion of the payment constitutes an increase in his income and aggregate resources. Thus it is eligible for inclusion in the calculus used to arrive at a modification of the alimony award. *Lepis v. Lepis, supra,* 83 *N.J.* at 151; *see Martindell v. Martindell, supra,* 21 *N.J.* at 355.

As previously stated, we do not decide whether plaintiff's alimony payments should be modified. That question is best left to the sound discretion of the trial court. In each case, the court must closely examine the circumstances of both parties. The court must make a complete and thorough analysis of the incomes, income capacities, and general financial circumstances, including assets and income, of both parties in reaching its conclusion. Depending on the parties' circumstances a court

the case at bar drafted their agreement several years before the *Horton* decision in a manner that clashes with that decision.

may award a spouse a disproportionate share of the other spouse's *actual* income.

What the trial court can no longer do, however, is determine alimony by considering income generated by a retirement share that has been equitably distributed, either at the time of divorce or when it considers a modification application. The Legislature has concluded that it is inappropriate to make equitable distribution of a retirement benefit and then consider that distributed share for purposes of determining alimony. As did the court in *D'Oro*, the Legislature found "double-dipping" of this asset to be improper.

Hence, we hold that payments generated by pension benefits that had been previously equitably distributed are not income for purposes of alimony modification. Further, we hold that annuity payments purchased with the proceeds of an equitable-distribution award also are not "income" for that purpose to the extent that they reflect return of the principal as opposed to income generated by the principal.

Accordingly, the Appellate Division judgment is affirmed in part and reversed in part and the cause remanded for further proceedings consistent with this opinion.

STEIN, J., concurring in part and dissenting in part.

This case involves an important issue of matrimonial law. The question concerns the Chancery Division's authority, on a husband's motion to modify an alimony obligation set forth in a property-settlement agreement, to consider the husband's monthly benefit payments from a pension that was treated as an asset for purposes of equitable distribution when the parties divorced. Reversing the Appellate Division, the Court today holds that prior decisional law absolutely bars such consideration of the pension benefit. The Court also holds that a recent amendment to *N.J.S.A.* 2A:34–23, *L.*1988, *c.* 153, absolutely bars any such consideration of the pension benefit. That amendment provides in part:

> When a share of a retirement benefit is treated as an asset for purposes of equitable distribution, the court shall not consider income generated thereafter by that share for purposes of determining alimony.

The Court concludes that this amendment is intended to apply retroactively to property-settlement agreements executed and to divorce judgments entered prior to the amendment.

In my view, the Court has overstated the precedential significance of prior decisional law on the issue in this case. It has also accorded the statutory amendment a scope and effect neither contemplated nor intended by the Legislature. Most important, the Court's opinion needlessly restricts the broad equitable powers of the Chancery Court to consider all relevant factors in deciding applications to modify alimony based on changed circumstances.

## I.

The majority opinion sets forth the relevant facts. I restate them only to the extent necessary to frame the issue. The trial court had to resolve an alimony-modification motion in a case in which both parties had limited funds. The Inneses divorced in March 1984, after thirty-three years of marriage, the last ten years of which they lived apart. Plaintiff was sixty-years old at the time of the divorce and had net earnings of $2,054 a month from his full-time employment. The agreement incorporated in the divorce judgment required plaintiff to pay alimony to defendant of $650 per month, terminable on the death of either party or the defendant's remarriage. The net proceeds from the sale of the marital home were to be equally divided. Defendant was to receive $19,000, representing forty percent of the value of plaintiff's pension as of the date the divorce complaint was filed, reduced by plaintiff's forty-percent share of the value of defendant's pension.[1] Plaintiff also agreed to

---

[1]When the marital home was sold and the proceeds distributed, plaintiff received $39,028.70 and defendant, $74,042.52; the difference reflected plaintiff's payment to defendant of approximately $17,500, representing her forty-

pay child support of $100 per month and to maintain defendant as beneficiary of a $50,000 life-insurance policy. The child-support obligation had terminated when the trial court issued the alimony-modification order that is the subject of this appeal.

Plaintiff's employer fired him in June 1985, fifteen months after the divorce. Two weeks later he moved to terminate alimony based on his changed circumstances. While that motion was pending, defendant moved to compel plaintiff to pay accumulated arrearages of $3,250, alleging that plaintiff had unilaterally terminated alimony payments after his discharge. Granting defendant's motion, the trial court compelled payment of alimony and the accumulated arrearages. On plaintiff's appeal the Appellate Division, with the consent of both parties, remanded to the trial court for reconsideration.

The trial court conducted the remand proceedings in March 1987, relying only on the parties' certifications and arguments of counsel. Although there are slight discrepancies between plaintiff's Case Information Statement and his certification filed in May 1986, both the Appellate Division, 225 *N.J.Super.* 242, 247–48, and the majority, *ante* at 501, adopt the following categorization of his monthly income at the time of the remand proceedings:

| | |
|---|---:|
| Pension | $ 720.00 |
| Social Security | 622.00 |
| Annuity (Purchased from proceeds of sale of marital home) | 160.00 |
| Income from IRA and other savings | 139.00 |
| | $1,641.00 |

Plaintiff's assets, excluding the annuity, had a value of $19,800.

At the time of the remand proceeding defendant was disabled and living in Florida. She received social security disability benefits of $280 monthly and a monthly payment from the

---

percent share of the value of plaintiff's pension, reduced by plaintiff's forty-percent share of the value of defendant's pension.

University of Pennsylvania of $420. (The record contains various references to this payment as a "pension." Presumably it is this pension that was valued and deducted from defendant's share of plaintiff's pension in calculating the amount payable to defendant in equitably distributing the marital assets.) Defendant also received unspecified income from a $60,000 cash-management account, established with defendant's share of equitable distribution proceeds. The Appellate Division estimated that income at $271 monthly, 225 *N.J.Super.* at 248. The majority's estimate is $400 per month. *Ante* at 501–502. Thus, depending on which estimate is used, defendant's income at the remand proceeding was between $971 and $1,100 monthly.

The trial court considered the needs and income of both parties, including their respective pensions, and modified plaintiff's future alimony obligation from $650 to $550 monthly. The court also awarded defendant arrearages and counsel fees.

The Appellate Division reversed and remanded for reconsideration because the trial court "made no findings as to the parties' circumstances." 225 *N.J.Super.* at 248. However, the Appellate Division, which did not address the propriety of the trial court's consideration of defendant's pension in resolving the alimony-modification motion, was divided on whether the trial court had properly considered *plaintiff's* pension benefits in calculating the appropriate amount of alimony. The majority held that the trial court should have considered plaintiff's pension benefits even though defendant had received a percentage of plaintiff's pension as equitable distribution in the divorce judgment. *Id.* at 247. According to the dissent, because plaintiff's pension was his "equitable share of [a] marital asset," it was not "includable in the calculation of available income for an alimony award." *Id.* at 249. Neither the majority nor dissenting opinion referred to the recent amendment to *N.J.S.A.* 2A:34–23.

## II.

Because the Court relies in part on "pre-existing case law," *ante* at 500, it is useful first to restate the general principles that govern resolution of alimony-modification motions. We need look no further than *Lepis v. Lepis*, 83 *N.J.* 139 (1980), in which Justice Pashman, writing for a unanimous Court, set forth the guiding substantive and procedural standards. Acknowledging that *N.J.S.A.* 2A:34–23 specifically recognizes the judiciary's equitable power to modify alimony and support orders, we noted in *Lepis* that

alimony and support orders define only the present obligations of the former spouses. Those duties are always subject to review and modification on a showing of "changed circumstances." [*Id.* at 146 (citations omitted).]

With respect to property-settlement agreements, we observed that at one time the judiciary's statutory power over alimony was considered to have terminated the Chancery Court's pre-existing equitable power specifically to enforce spousal support agreements. *Ibid.* (citing *Apfelbaum v. Apfelbaum*, 111 *N.J. Eq.* 529 (E. & A.1932)). Repudiating that rule, *Schlemm v. Schlemm*, 31 *N.J.* 557 (1960), reaffirmed the long-standing power of the Chancery Court, apart from its statutory authority, specifically to enforce spousal-support agreements "to the extent they are just and equitable." *Id.* at 581–82. The relevant considerations for determining whether support agreements are equitable "include not only the ability to pay and the respective incomes of the spouses but the needs of each spouse as well." *Petersen v. Petersen*, 85 *N.J.* 638, 645 (1981); *accord Martindell v. Martindell*, 21 *N.J.* 341, 355 (1956) ("When an application for alteration of alimony is presented, the court should justly consider all relevant circumstances, including particularly the changed needs of the former wife and the changed financial resources of the former husband.").

In *Lepis* we also noted our holding in *Smith v. Smith*, 72 *N.J.* 350 (1977), disapproving of the rule that had developed requiring that "[a] far greater showing of changed circumstances * * * be made before the court can modify a separation agree-

ment than need be shown to warrant the court amending an order for alimony or support." *Lepis, supra,* 83 *N.J.* at 147 (quoting *Schiff v. Schiff,* 116 *N.J.Super.* 546, 561 (App.Div. 1971), certif. denied, 60 *N.J.* 139 (1972)). We held in *Smith:*

> Henceforth the extent of the change in circumstances, whether urged by plaintiff or defendant, shall be the same, regardless of whether the support payments being questioned were determined consensually or by judicial decree. In each case the court must determine what, in the light of all the facts presented to it, is equitable and fair, giving due weight to the strong public policy favoring stability of arrangements. [72 *N.J.* at 360.]

We also set forth in *Lepis* examples of factors that have been held to constitute changed circumstances and emphasized

> that "changed circumstances" are not limited in scope to events that were unforeseeable at the time of divorce. * * * The proper criteria are whether the change in circumstance is continuing and whether the agreement or decree has made explicit provision for the change. [83 *N.J.* at 151, 152.]

We acknowledged in *Lepis* that parties should be permitted to prove that other provisions of the agreement were included for the purpose of anticipating or offsetting the "changed circumstance" alleged as the basis for modification of a spousal-support agreement:

> If the existing support arrangement has in fact provided for the circumstances alleged as "changed," it would not ordinarily be "equitable and fair," *Smith,* 72 *N.J.* at 360 , to grant modification. For example, although a spouse cannot maintain the marital standard of living on the support payments received, this would not ordinarily warrant modification if it were shown that a single large cash payment made at the time of divorce was included with the express intention of meeting the rising cost of living. In other cases, the equitable distribution award—which we have recognized is intimately related to support, *id.*—might have been devised to provide a hedge against inflation. The same might be true with respect to child support. A lump sum payment or a trust established for the benefit of the children could be shown to have been designed to cover the certain eventuality of increasing needs. [*Id.* at 153 (footnote omitted).]

We emphasized in *Lepis* the bifurcated procedure to be employed in post-judgment motions to modify the support provisions of spousal agreements. We held:

> The party seeking modification has the burden of showing such "changed circumstances" as would warrant relief from the support or maintenance provisions involved. A *prima facie* showing of changed circumstances must be made before a court will order discovery of an ex-spouse's financial status. * * *

Only after the movant has made this *prima facie* showing should the respondent's ability to pay become a factor for the court to consider. * * * Courts have recognized that discovery and inspection of income tax returns should only be permitted for good cause. Because financial ability of the supporting spouse may be crucial to the proper disposition of a motion for modification, we conclude that a *prima facie* showing of changed circumstances meets this good cause standard. [*Id.* at 157–58 (citations and footnote omitted).]

Finally, we held in *Lepis* that not every application for modification of support requires a plenary hearing:

[A] party must clearly demonstrate the existence of a genuine issue as to a material fact before a hearing is necessary. [*Id.* at 159.]

Application of the *Lepis* principles to the facts of this case raises the preliminary issue whether the plaintiff's loss of full-time employment and the reduction of his net income from $2,054 to $1,641 monthly, offset by termination of his child-support obligation, constituted a change of circumstances sufficient to warrant modification of defendant's monthly alimony. Determination of that question—which is a pre-condition to resolving whether modification of alimony is appropriate and, if so, whether plaintiff's pension can be taken into account in re-establishing alimony—should focus on the intention of the parties as expressed in the property-settlement agreement. The agreement, entered into when plaintiff was sixty years of age, provides that alimony is payable until the death of either party or until defendant's remarriage, but does not provide for termination on cessation of full-time employment. It would have been preferable for the parties to have made express provision in the agreement to indicate the effect on alimony, if any, of plaintiff's discharge from or termination of employment. *Id.* at 154. But *Lepis* does not preclude this defendant, or other supported spouses similarly situated, from attempting to prove that the amount of alimony set forth in the agreement was intended to be maintained whether or not plaintiff continued to be employed. *Cf. Berkowitz v. Berkowitz*, 55 *N.J.* 564 (1970) (modification of child-support payments was unjustified where parties envisioned alleged "changed circumstances" and provided for them in agreement). Thus, in cases raising the

preliminary issue whether termination of employment is a changed circumstance sufficient to justify modification of alimony, consideration of a supporting spouse's pension may be highly material to the question whether the parties intended alimony to continue at the prescribed level after the husband's retirement, even if the pension was taken into account for purposes of equitable distribution.

The majority opinion relies in part on pre-existing case law for its conclusion that pension benefits treated as assets for equitable distribution cannot be considered as income in an alimony-modification proceeding, citing *D'Oro v. D'Oro,* 187 *N.J.Super.* 377 (Ch.Div.1982), *aff'd,* 193 *N.J.Super.* 385 (App. Div.1984), and *Staver v. Staver,* 217 *N.J.Super.* 541 (Ch.Div. 1987). *Ante* at 505–506. I find the pre-existing case law on this question to be both inconclusive and unpersuasive.

In *D'Oro v. D'Oro, supra,* 187 *N.J.Super.* 377, the parties divorced in 1982 after thirty-seven years of marriage. The defendant was sixty-four years old and intended to retire in July 1982. Unlike this case, the parties in *D'Oro* had not entered into a property-settlement agreement. As part of equitable distribution, the trial court awarded plaintiff one-third of the value of defendant's pension and also awarded her alimony of $685 monthly. In October of that year, after his anticipated retirement, defendant moved for elimination of alimony on the basis that his monthly income, exclusive of his pension benefit, was less than plaintiff's income. The court granted defendant's motion to eliminate alimony, concluding that defendant's pension could not be considered as income in determining his ability to pay alimony. The court expressly left open the question whether defendant's pension could be considered as a source of alimony after defendant had received payments equalling two-thirds of the value of the pension at the time of the divorce:

> [T]his court finds that plaintiff has received the present use of her share of defendant's pension. Defendant has not. He must, perforce, survive for a

stated time to receive such dollars as may equate to ⅔ of his share of "present value," including developmental and cumulative interest.

This court finds that plaintiff is *not* entitled to have defendant's pension flow considered as income to him for modification consideration. Whether such consideration should be given *after* such point in time as defendant has received his share of "present value" is left to another day. [*Id.* at 379–80.]

The holding in *D'Oro* cannot be regarded as a settled principle of matrimonial law. It was distinguished in *Johns v. Johns,* 208 *N.J.Super.* 733 (Ch.Div.1985), in which the court held that benefits from a pension that had been equitably distributed in the divorce judgment should nevertheless be considered as income for purposes of child support. *Id.* at 736–37. *D'Oro* was followed in *Staver v. Staver, supra,* 217 *N.J.Super.* 541, in which the court also ruled that the husband's pension could be considered for purposes of alimony to the extent that post-divorce earnings had enhanced its value. *Id.* at 545.

However, in *Horton v. Horton,* 219 *N.J.Super.* 76 (Ch.Div. 1987), Judge Krafte, who decided *D'Oro,* declined to apply that case when the plaintiff-husband took early retirement at age fifty-six, one-and-one-half years after the parties had divorced. The divorce decree incorporated a property-settlement agreement that provided for alimony of $125 weekly; it also provided for distribution of the marital home to the wife and the full value of the pension to the husband. The court rejected plaintiff's contention that the value of his pension could not be considered as income in determining his ability to pay alimony:

Plaintiff's reliance upon *D'Oro* is misplaced. In that case, it was expressly stated at the trial that the husband intended to retire in several months. In the present case, no such imminent retirement was considered. There was no reason for defendant to consider that plaintiff would not work for the normally anticipated time. No early retirement was anticipated or bargained for. Plaintiff surrendered employment paying some $34,000, at age 55, and now has a pension income of $13,794.36, gross. *D'Oro* must be limited to its facts. When imminent retirement is anticipated and equitable distribution and alimony are bargained for, or, barring those factors, the parties *specifically* anticipate alimony adjustment on retirement (early or otherwise) *D'Oro* will apply. [*Id.* at 78.]

Implicit in the holding in *Horton* is the suggestion that in certain cases a husband's voluntary termination of employment

might be regarded as a self-induced "changed circumstance," not warranting modification of a prior alimony agreement. Whatever its underlying rationale, *Horton* illustrates that the scope and precedential force of *D'Oro* is unresolved. In view of Judge Krafte's comment in *Horton* that "*D'Oro* must be limited to its facts," *ibid.*, it is clear that *D'Oro* affords but fragile support for the majority's conclusion that the recent amendment to *N.J.S.A.* 2A:34–23 "is curative, merely reflective of preexisting law." *Ante* at 509. Significantly, the Appellate Division decision here, filed six months prior to the amendment to *N.J.S.A.* 2A:34–23, specifically rejects the *D'Oro* rule. 225 *N.J.Super.* at 247. I would characterize the law prior to the statutory amendment as unsettled and sorely in need of this Court's clarification.

### III.

Subsequent to the Appellate Division decision in this case, the legislature passed *L.*1988, *c.* 153, which "establishes standards to guide the courts *in rendering decisions* related to child support, alimony and equitable distribution." Senate Judiciary Statement, Senate Bill No. 976 (emphasis added). The Legislature explicitly mandated that *L.*1988, *c.* 153 "shall take effect on September 1, 1988, and *shall apply only to orders and judgments entered after that date.*" *L.*1988, *c.* 153, § 9 (emphasis added); *cf. Gibbons v. Gibbons*, 86 *N.J.* 515, 520–21 n. 4 (1981) (When signing into law *L.*1980, *c.* 181, exempting from equitable distribution property acquired during marriage by gift, devise or bequest, Governor acknowledged absence of any legislative consensus on Act's retroactive application.). Remarkably, the majority ignores the Legislature's explicit direction and concludes that the pertinent provision of the amendment should be applied *retroactively* to the 1984 divorce judgment in this case and to the property-settlement agreement incorporated in that judgment. The majority's conclusion is clearly erroneous. Equally erroneous, although perhaps not so clear, is the majority's conclusion that the pertinent language of

the amendment should apply not only to original awards of alimony but also to modifications of property-settlement agreements.

I first address the majority's holding that the pertinent provision of chapter 153 applies retroactively. As amended by chapter 153, *N.J.S.A.* 2A:34–23b provides in part:

In all actions brought for divorce, divorce from bed and board, or nullity the court may award permanent or rehabilitative alimony or both to either party, and in so doing shall consider, but not be limited to, the following factors:

(1) The actual need and ability of the parties to pay;

(2) The duration of the marriage;

(3) The age, physical and emotional health of the parties;

(4) The standard of living established in the marriage and the likelihood that each party can maintain a reasonably comparable standard of living;

(5) The earning capacities, educational levels, vocational skills, and employability of the parties;

(6) The length of absence from the job market and custodial responsibilities for children of the party seeking maintenance;

(7) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, the availability of the training and employment, and the opportunity for future acquisitions of capital assets and income;

(8) The history of the financial or non-financial contributions to the marriage by each party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;

(9) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair; and

(10) Any other factors which the court may deem relevant.

*When a share of a retirement benefit is treated as an asset for purposes of equitable distribution, the court shall not consider income generated thereafter by that share for purposes of determining alimony.* [Emphasis added.]

Prior to the enactment of chapter 153, the corresponding portion of *N.J.S.A.* 2A:34–23 provided:

In all actions brought for divorce, divorce from bed and board, or nullity the court may award alimony to either party, and in so doing shall consider the actual need and ability to pay of the parties and the duration of the marriage. In all actions for divorce other than those where judgment is granted solely on the ground of separation the court may consider also the proofs made in establishing such ground in determining an amount of alimony or maintenance that is fit, reasonable and just.

The Senate Judiciary Committee Statement to chapter 153 emphasizes that the amendment authorizes the award of both permanent and rehabilitative alimony and supplements the criteria formerly used to set alimony—actual need, ability to pay, and duration of the marriage—with a number of additional statutory factors. As Justice O'Hern points out in his dissent, the predecessor bill to chapter 153, relying on the Report of the Commission on Sex Discrimination in Marriage and Family Law, was introduced "for the express purpose of eliminating inequities in divorce and alimony statutes that had worked to the detriment of women * * *." *Post* at 536. The statutory factors established by chapter 153, consistent with that objective, mandate that courts consider a variety of historic, economic, and personal factors in arriving at an appropriate award of alimony. Because the new criteria set forth in chapter 153 effect so substantial a change in the alimony statute, it is understandable that the Legislature explicitly provided that chapter 153 apply only prospectively.

We explained in *Gibbons* that the traditional rule of statutory interpretation is one favoring prospective application of statutes:

> The courts of this State have long followed a general rule of statutory construction that favors prospective application of statutes. *E.g., Skulski v. Nolan,* 68 *N.J.* 179, 202 (1975); *LaParre v. Y.M.C.A. of the Oranges,* 30 *N.J.* 225, 229 (1959); *Kopczynski v. County of Camden,* 2 *N.J.* 419, 424 (1949); *Burdett v. Municipal Employees Pension Comm'n of Newark,* 129 *N.J.L.* 70, 72–73 (E. & A.1942); *Weinstein v. Investors Savings and Loan Ass'n,* 154 *N.J.Super.* 164, 167 (App.Div.1977). The rationale for this rule has been succinctly stated as follows:
>
>> "It is a fundamental principle of jurisprudence that retroactive application of new laws involves a high risk of being unfair. There is general consensus among all people that notice or warning of the rules that are to be applied to determine their affairs should be given in advance of the actions whose effects are to be judged by them. The hackneyed maxim that everyone is held to know the law, itself a principle of dubious wisdom, nevertheless presupposes that the law is at least susceptible of being known. But this is not possible as to law which has not been made. [2 Sutherland, *Statutory Construction,* § 41.02 at 247 (4th ed. 1973) quoted in *Weinstein v. Investors Savings, supra,* 154 *N.J. Super.* at 167.]"

[86 *N.J.* at 521–22 (footnote omitted).]

Moreover,

[a] cardinal rule in the interpretation of statutes is that words in a statute ought not to have a retrospective operation unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intent of the Legislature cannot otherwise be satisfied. [*Kopczynski v. County of Camden,* 2 *N.J.* 419, 424 (1949).]

We took note in *Gibbons* of some exceptions to the general rule of prospectivity: statutes in which the Legislature has expressed a contrary intent; statutes that are ameliorative or curative; and statutes lacking clear provision for prospective application where retroactive application would better serve the expectations of affected parties. 86 *N.J.* at 522–23. None of these exceptions applies to chapter 153.

The Legislature has unmistakably expressed its intent that the statute apply prospectively. Although the majority asserts that chapter 153 is "curative, merely reflective of preexisting law," *ante* at 507, that statement is simply incorrect, whether it is addressed to *all* of the alimony-related provisions of chapter 153 or merely to the specific provision at issue in this case. As noted, the statutory criteria for alimony adopted by chapter 153 are new, replacing the significantly-less-specific standard of prior law. The uncertain state of prior law concerning the relevance of a pension, considered as an asset for equitable distribution, to an application to modify the alimony provision of a property-settlement agreement has been previously discussed. *Supra* at 507–509. Moreover, it is inaccurate to characterize chapter 153 as "curative" to sustain its retroactive application. As explained by Sutherland:

A curative act is a statute passed to cure defects in prior laws * * *. Generally, curative acts are made necessary by inadvertence or error in the original enactment of a statute or in its administration. [N. Singer, 2 *Sutherland Statutory Construction* § 41.11 (Sands 4th ed.1986).]

The Legislature adopted chapter 153 to set new and more comprehensive standards to guide courts in determining alimony and equitable distribution, not to "cure" a defect in the prior law.

We also observed in *Gibbons* the need to avoid "manifest injustice" in determining the appropriateness of retroactivity, focusing on whether a party "relied, to his or her prejudice, on the law that is now to be changed as a result of the retroactive application of the statute" and on whether "it would be unfair to apply the statute retroactively." 86 *N.J.* at 523–24. This inquiry highlights the most persuasive argument against retroactive application of chapter 153's prohibition against the double-counting of pensions. The prohibition's underlying premise is quite obvious: it ordinarily would be unfair for a *court* to compel a husband to pay alimony out of a pension that he has already shared with his ex-spouse as part of equitable distribution of their assets.

Notwithstanding this theoretical unfairness, parties to settlement agreements executed prior to chapter 153 were completely free to negotiate and execute agreements that took into account a retirement benefit as a source of *both* equitable distribution and alimony. Perhaps the wife's equitable share of a retirement benefit might have been diminished in order to justify greater alimony. Or the overall payout of equitable distribution might have been deferred over a longer term in return for higher alimony. Alternatively, a husband might agree to equitable distribution of a pension, and a level of alimony dependent in part on that pension, in return for other negotiated advantages—the right to continue to live in the marital home or the right to retain a vacation home. The nuances of give-and-take negotiation that may find expression in complex property-settlement agreements are unlimited.

In that context it would be incongruous to attempt to apply chapter 153's prohibition against double-counting of pensions retroactively. It is one thing for the Legislature to prohibit courts in the future from treating a pension simultaneously as an asset for equitable distribution and as income for purposes of alimony. But the Legislature would not and did not ordain that previously-negotiated agreements, in which the parties had voluntarily considered a pension for both purposes, must retro-

actively be invalidated. Retroactive application of chapter 153 to the property-settlement agreement in this case is clearly erroneous and contradictory to the statute's express provision mandating only prospective application.

The majority's reliance on *Rothman v. Rothman*, 65 *N.J.* 219 (1974), is misplaced. Noting that *Rothman* held that the equitable distribution statute "was to be retroactively applied," *ante* at 510, the majority reasons that chapter 153 should also be retroactive. The *Rothman* analogy does not support the majority's conclusion. Although we held in *Rothman* that the equitable-distribution statute, *L.*1971, *c.* 212, would apply to property acquired prior to the statute's effective date, in all other respects the statute's application was prospective only. See *N.J.S.A.* 2A:34–1. Thus, we held in *Smith v. Smith*, 72 *N.J.* 350 (1977), that the equitable-distribution statute does not invalidate an earlier property-settlement agreement that constituted the "substantial equivalent of an equitable distribution of marital assets." *Id.* at 358.

In my view, the Court's holding that chapter 153 applies to agreements executed prior to its enactment is most extraordinary, particularly in the face of the legislative directive that it apply prospectively. There is the potential for unjust results if the holding is applied to agreements in which the parties anticipated that a pension benefit might serve as a source for both equitable distribution and alimony. I trust that trial judges, alert to such potential injustices, will consider in such cases whether the party seeking a reduction in alimony has demonstrated the existence of changed circumstances, a question whose resolution may make consideration of chapter 153 unnecessary.

Similar analysis suggests that chapter 153's prohibition against double-counting of pensions should not apply even prospectively to applications for modification of alimony agreements entered into *after* its effective date. Rather, I would construe the prohibition to apply only to cases in which a court

is *determining* both equitable distribution and alimony, and not to cases involving modification of property-settlement agreements.

The plain language of the statute supports limiting application of chapter 153's prohibition against double-counting of pensions. As amended, *N.J.S.A.* 2A:34–23b provides in pertinent part as follows:

> In all actions brought for divorce * * * or nullity *the court may award* permanent or rehabilitative alimony or both to either party, *and in so doing shall consider* but not be limited to the following factors. [Emphasis added.]

After itemizing the ten specific criteria to be considered by a court in fixing alimony, the statute provides:

> When a share of a retirement benefit is treated as an asset for purposes of equitable distribution, *the court* shall not consider income generated thereafter by that share for purposes of determining alimony. [*Ibid.* (emphasis added).]

The literal language of *N.J.S.A.* 2A:34–23b appears to restrict the bar against double-counting of pensions only to cases in which a court—not the parties—is determining equitable distribution and alimony.

The most basic tenet of statutory interpretation is that the words of a statute, absent any ambiguity, should be construed in accordance with their plain meaning. *State v. Butler*, 89 *N.J.* 220, 226 (1982); N Singer, 2A *Sutherland Statutory Construction* § 46.01 (Sands 4th ed.1984). This principle dictates that chapter 153's prohibition against double-counting of pensions applies only to court-determined awards of alimony where the court has treated the retirement benefit as an asset for purposes of equitable distribution. The statutory prohibition against double-counting of pensions does not mention property-settlement agreements, and nothing in the legislative history of chapter 153 remotely suggests that the Legislature intended that prohibition to apply to voluntarily-negotiated agreements. Although prohibiting a court from relying on a retirement benefit for purposes of both equitable distribution and alimony is an obvious legislative purpose, prohibiting parties from voluntarily negotiating property-settlement agreements

that contemplate the use of a pension for both those purposes serves no legislative goal.

Prospective application of the pension double-counting prohibition to alimony-modification motions directed at property-settlement agreements would also have the effect of inhibiting parties from negotiating in good faith agreements that consider one spouse's pension for both equitable distribution and alimony. Although such agreements may be relatively unusual, a variety of circumstances might induce parties voluntarily to consider a pension benefit for both purposes. Apart from any other factors, a dependent spouse might agree to accept a relatively small share of a pension for equitable distribution in return for a guaranteed amount of alimony that contemplates payments in part from the supporting spouse's pension. Application of the statutory prohibition against double-counting to such an agreement, on a motion to modify alimony, would plainly frustrate the parties' understanding: in effect, the statute would prohibit a court from considering pension benefits that the parties intended to be a partial source of permanent alimony. Such an application of chapter 153 would unnecessarily inhibit parties from voluntarily negotiating agreements in which a retirement benefit is intended, at least in part, to contribute both to equitable distribution and alimony.

Finally, the majority's application of chapter 153's prohibition against double-counting of pensions to property-settlement agreements encroaches on the historic power of the Chancery Court to modify such agreements based on changed circumstances. *Lepis, supra,* 83 *N.J.* at 146; *Chalmers v. Chalmers,* 65 *N.J.* 186, 192 (1974); *Martindell v. Martindell,* 21 *N.J.* 341, 352–53 (1956); *Boorstein v. Boorstein,* 142 *N.J.Eq.* 135 (E. & A.1948); *Lindquist v. Lindquist,* 130 *N.J.Eq.* 611, 613 (E. & A.1941); *Parmly v. Parmly,* 125 *N.J.Eq.* 545, 548–49 (E. & A.1939). No sound reason exists for construing chapter 153 to restrict the long-standing equitable power of courts to consider and resolve alimony-modification motions. In *Schlemm v. Schlemm, supra,* 31 *N.J.* 557, the Chancery Court's power

specifically to enforce property-settlement agreements was challenged on the basis that the statutory provisions relating to alimony were preemptive. Justice Jacobs, writing for a unanimous Court, held that the Chancery Court's statutory authority over alimony does not supersede its inherent jurisdiction to grant specific performance of such agreements.

> *Apfelbaum* [*v. Apfelbaum*, 111 *N.J.Eq.* 529 (E. & A.1932)] (and the cases which followed it) broadly intended to withdraw from Chancery the equitable power to grant specific performance of support agreements in the belief that the statutory provisions relating to alimony were more flexible and should be dealt with as exclusive. But, as we have already indicated, such belief failed to take into account the highly flexible nature of Chancery's specific performance jurisdiction and its earlier application by the New Jersey courts in the enforcement of husband-wife support agreements to the extent that they were just and equitable. We are satisfied that the restrictive approach in *Apfelbaum* was an unnecessary departure from fundamental principles of equitable jurisdiction, was not dictated by any sound reason or any statutory policy, and does not effectively serve the interests of justice; it may now be considered as discarded in favor of the view that, apart from its statutory authority, the Superior Court has power to direct the specific performance of the terms of husband-wife support agreements to the extent that they are just and equitable. [*Id.* at 581–82 (citation omitted).]

## IV.

On the assumption that chapter 153's prohibition against double-counting of pensions does not apply at all to motions to modify property-settlement agreements, or at least does not apply retroactively to such agreements, there remains for consideration only the question left unresolved by *D'Oro v. D'Oro, supra,* 187 *N.J.Super.* 377, and its progeny: on the motion to modify alimony provided for in this property-settlement agreement, to what extent should the court have considered pension benefits that the parties treated as an asset for purposes of equitable distribution.

*Lepis* provides the proper analytical approach. The preliminary issue is whether the moving party has sustained "the burden of showing such 'changed circumstances' as would warrant relief from the support or maintenance provisions involved." *Id.* at 157. Presumably the supporting spouse, as here, would rely on a reduction in income resulting from termi-

nation of full-time employment and would seek to exclude the pension benefit as a source of alimony. The dependent spouse should be permitted to prove, for example, that the parties had negotiated the alimony award set forth in the property-settlement agreement with the expectation of retirement and use of the pension as a partial source of alimony, and hence that circumstances have not changed. Assuming the court is satisfied that alimony was determined with the expectation of continued full-time employment and that retirement or discharge constitutes proof of "changed circumstances," the question of modification of alimony must be resolved case by case. In the ordinary case, requiring a supporting spouse to pay alimony out of a pension that has already been subject to equitable distribution would obviously be unfair. However, on a modification motion, where the focus is on the proper amount of support for an economically dependent spouse,

> the general considerations are the dependent spouse's needs, that spouse's ability to contribute to the fulfillment of those needs, and the supporting spouse's ability to maintain the dependent spouse at the former standard. [*Id.* at 153.]

In the Appellate Division, the majority held that the pension could be considered on the modification motion as a source of alimony, reasoning that "equitable distribution and alimony are not the same" and hence that it was

> not inconsistent for a dependent wife to receive the value of a portion of her husband's pension as her share of the marital partnership, and nevertheless look to later pension payments as evidence of her former husband's ability to contribute towards maintaining her at their former marital economic standard. [225 *N.J.Super.* at 245–46.]

The dissenting judge took the position that the pension, treated as an *asset* for equitable distribution, could not thereafter be regarded as income for alimony purposes:

> Here, the pension payments sought to be tapped by defendant as alimony are plaintiff's equitable share of the marital asset; as such they are not includable in the calculation of available income for an alimony award. It is not the fact that the pension was part of the marital distribution which is pivotal. It is that the pension is not income. Simply stated, no asset, however derived, should be considered part of the income available for alimony purposes. [*Id.* at 249.]

In my view, a middle ground between these two positions better expresses the traditional function of the Chancery Court. Although equitable distribution and alimony serve different purposes, courts should recognize that parties ordinarily would be disinclined to look to a pension as a source for both. But it is too categorical to conclude that because a pension is treated as an asset for equitable distribution purposes, it can never be regarded as a partial source of alimony. Thus, if the pension has already been the subject of equitable distribution, a court must take that use of the pension into account in adjusting alimony. Ideally, a pension that was divided for equitable distribution purposes should be excluded as a source of alimony. Even if the circumstances of the parties are such that total exclusion of the pension would result in a disproportionate burden on the dependent spouse, a court must consider the pension's role in equitable distribution. Thus, the greater the dependent spouse's share of the pension's value as equitable distribution, the less a court should rely on the pension as a source for alimony.

Therefore, the general rule should be that when the parties valued a retirement benefit for purposes of equitable distribution, a court reviewing a motion to modify the alimony provisions of a property-settlement agreement would not ordinarily consider it as a source of alimony. The dependent spouse should be permitted to contest the existence of changed circumstances by proving that the parties contemplated that the retirement benefit would replace employment earnings as the source of alimony. If the court finds that changed circumstances have been established, resort to the retirement benefit as a partial source of alimony should be restricted only to those cases in which the minimal needs of the dependent spouse cannot otherwise be addressed. In such cases, the extent to which the retirement benefit may be looked to as a source of alimony should be influenced by the extent to which its value was distributed to the supported spouse as part of equitable distribution. Thus, the bar against double-counting of the

retirement benefit should be presumptive, but not absolute, in order that the Chancery Court may properly perform its intended function:

> When an application for alteration of alimony is presented, the court should justly consider all relevant circumstances, including particularly the changed needs of the former wife and the changed financial resources of the former husband. [*Martindell v. Martindell, supra,* 21 *N.J.* at 355.]

Although I am in accord with the majority's conclusion that the matter should be remanded to the trial court for reconsideration, my view is that such reconsideration should be based on the principles set forth in this opinion.

Justice O'HERN joins in this opinion.

O'HERN, J., concurring in part and dissenting in part.

While I concur in Justice Stein's analysis of the Legislature's undoubted intent not to have these 1985 support guidelines applied retroactively to invalidate preexisting agreements or prospectively to modify certain agreements, I add these few observations about the devastating effect of the majority's opinion on most homemaker-wives. Only those who can speak out of both sides of their mouths will find solace in the opinion of the Court.

After thirty-one years of marriage, Frank T. Innes entered a solemn contract on March 26, 1984 to pay his soon-to-be-divorced wife $650 per month in alimony. He did not say, "I promise to pay $650 per month so long as I am employed by Monroe Systems for Business." He said he would pay until "the death of the plaintiff, the death of the defendant or the remarriage of the defendant."

He lived up to that promise for a little over a year, but when he lost his job with Monroe Systems for Business he decided that he would not support his wife anymore. He unilaterally suspended his alimony payments. His wife had to bring an action to compel him to live up to his contract to pay the agreed

support. In those proceedings the trial court allowed him a reduction of $100 per month.

I feel sorry that a corporate restructuring caused Mr. Innes to be displaced from his job and take an early retirement. I am sure that the Family Part has balanced, and would balance, the equities of the situation properly. But I fail to see how the legislation that was enacted to correct sex discrimination in marriage and family law could be interpreted to cause the abrogation of his agreement.

Were there fraud, or a change of circumstances that was not reasonably foreseeable, I could see the majority's position. But what we have is a disabled spouse who has moved to Florida in reliance on her husband's promise. All that she asks is that before letting the husband out of his contract, a court consider how well off he really may be.

The cloth is quite binding in this case because the husband does not have a golden parachute or anything of that nature. There is not a lot of money to go around. But let us up the ante a bit and consider the case as one involving a top executive at Warner Communications who loses his job in a merger with Time, Inc. And assume that he too had entered an agreement to pay his wife $650 per month and had given her a share of his pension in equitable distribution from which she bought a home. Then assume that he is eased out, but that his pension will give him $70,000 per year in income. Would it be wrong to think that he is able to meet his commitments to the wife who had helped him up the corporate ladder? I should hope not.

It will strike the sponsors of the legislation to implement the report of the New Jersey Commission on Sex Discrimination in Marriage and Family Law (Commission) as the bitterest parody of justice that the law they sponsored to counter discrimination against women in our divorce law should have the unintended consequence of tearing up separation agreements.

The legislative history of the bill is quite adequately set forth in the brief for the defendant-wife. The bill that eventually

amended *N.J.S.A.* 2A:34–23 was introduced in 1981 by Senators Lipman and DiFrancesco for the express purpose of eliminating inequities in divorce and alimony statutes that had worked to the detriment of women, keeping them in economic bondage. The uncertain economic plight of divorced homemakers was of special import to the sponsors of the bill. The sponsors relied on the report of the Commission. *See Discrimination in Marriage and Family Law: New Jersey Commission on Sex Discrimination in the Statutes* (2d Report, Sept.1981). Some excerpts from a Commission report prepared in conjunction with Senators Lipman and DiFrancesco's 1984 version of the bill are illustrative of the sponsors' concerns.

Research indicated that divorce led to improved economic status for men while lessening the economic status of women. The wage-earning spouse continued to reap the benefits of what had been acquired through the joint efforts of the parties, increased assets and earning potential, while the homemaker with fewer skills and much less work experience endured a "dramatically difficult change in lifestyle." New Jersey Commission on Sex Discrimination in the Statutes, *Analysis of Senate Bill 554: Background,* p. 7 (1984). Concluding that divorce "discriminates against the non-wage-earning partner," the Commission's recommended factors for determining alimony emphasized that "alimony is an appropriate tool for bringing a non-wage-earning spouse up to par with the wage-earner." *Ibid.*

We know little about the Inneses, but we can infer that the homemaker-spouse also worked outside the home. She does have a retirement pension from the University of Pennsylvania. Nonetheless, the principle adopted by the majority would be applicable to the prototype situation that concerned the Commission. In most marriages, as the Commission noted, "one spouse may have foregone earning potential in performing the domestic duties * * *. It would be inequitable upon dissolution to saddle (this spouse) with the burden of reduced earning potential and allow the (other) spouse to continue in an advanta-

geous position which was reached through joint effort." *Id.* at 11. In such a case, in which a wife helped her husband up the corporate ladder, we can see how the majority's interpretation would work to her disadvantage.

The particular provision the Court relies on was not part of either the 1981 or 1982 versions of *N.J.S.A.* 2A:34–23. It was not until 1985 that a proposed Assembly Bill added the following language to the factors for determining an alimony award:

When a share of income that is earned but not received from a profession or business is treated as an asset for purposes of equitable distribution, the court shall not consider that income when it is received for purposes of determining alimony and child support.

The drafters of the proposed 1985 version also addressed the issue in terms of equitable distribution. They added the following language to the 1985 bill:

When the court awards a share of the future income of a business or profession as *pendente lite* support, alimony or child support, it shall not include the same income in its award of equitable distribution.

In other words, do not count the income twice. Do not award alimony from anticipated future income and then capitalize it and treat it as a marital asset. The purpose of the amendment was simple: to prevent that kind of double-dipping. The sponsors deleted that language, however, because.they thought that it would prove unworkable and lead to protracted litigation.

A later version of the bill, Assembly Bill No. 2619, contained the predecessor language to the current amendment to *N.J.S.A.* 2A:34–23. It read:

When a share of a retirement benefit is treated as an asset for purposes of equitable distribution, the court shall not consider income generated thereafter by that asset for purposes of determining alimony.

It carries the same logical intent, namely, no double-counting of income.

The current language appears to have been added for fear that in awarding alimony courts might not consider income derived from retirement assets that were *not* subject to equitable distribution. In other words, if the parties were married for only ten years and the pension was of thirty years

longevity, the first twenty years would belong only to the husband. That income can be counted. The last amendment was obviously a restrictive amendment intended to narrow the scope of the bill.

None of these factors is present in this case. There has been no double-counting in this case. The husband made an agreement to pay alimony. In reaching that agreement, no portion of his pension was double-counted for purposes of the property settlement.

What we have is a case in which the court must consider, in the context of *Lepis v. Lepis*, 83 *N.J.* 139 (1980), whether this so-called "change in circumstances" is one that was indeed not reasonably foreseeable by the parties in the making of the contract. Because the husband was sixty years old when the agreement was entered and normal retirement age would be sixty-five, an early retirement was clearly within the foreseeable future for this husband. It may be bad drafting or bad planning on his part, but I do not think it calls for the draconian interpretation that the Court imposes on the statutes designed to ameliorate the condition of women, not eviscerate their condition.

The limited purposes of the recent amendment to *N.J.S.A.* 2A:34-23, *i.e.*, to prevent double-counting, do not in any sense require cancellation of this property settlement. This does not mean, as the majority opinion assumes, that the Family Part will blind itself to the realities of the situation. There is only so much money to go around in this case. But the affidavits show which of the two partners in this long marriage is now in a better position to cope with this economic adversity. Mrs. Innes is disabled. She is unable to work. There is nothing to indicate that Mr. Innes is unable to work. Presumably, he has chosen not to work. I cannot fault him for this. It is something to which we all aspire. Many of us would like to get out of our contracts at age sixty-one if we could. Life just does not work that way. (I should not prejudge Mr. Innes' ability to find

work. It is undoubtedly not an easy time for him either. But the majority's opinion would apply as well to one who took an elective early retirement.)

Hence, I think the majority of the Appellate Division panel resolved the statutory issue correctly. The loss of employment by the spouse is a factor appropriately to be considered; on the other hand, the Family Part is not to blind itself to the husband's other available resources in meeting his contractual commitments. I am sure that the sound discretion of our Family Part judges would result in an equitable disposition of the matter.

Justice STEIN joins in this opinion.

*For affirmance in part, reversal in part*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK and GARIBALDI—4.

*For concurrence in part, dissent in part*—Justices O'HERN and STEIN—2.