**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2599-23

SAMUEL R. YOUNG,

      Plaintiff-Appellant,

v.

MELISSA M. YOUNG,
n/k/a MELISSA M. WOLFE,

      Defendant-Respondent.

_____

Submitted December 1, 2025 – Decided February 3, 2026

Before Judges Natali and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FM-01-0707-16.

Law Office of Thomas J. Hurley, LLC, attorney for appellant (Thomas J. Hurley, on the briefs).

Jacobs & Barbone, PA, attorneys for respondent (David A. Castaldi, on the brief).

PER CURIAM

Plaintiff Samuel R. Young appeals from orders entered on March 18 and April 18, 2024 (in part), following a plenary hearing in the Family Part. The March 18 order granted defendant Melissa M. Wolfe's application to enforce alimony, including the payment of arrears, and awarded counsel and expert fees as detailed in the subsequent April order. Plaintiff primarily argues the court misapplied the standard for modification or termination of alimony under Lepis v. Lepis, 83 N.J. 139 (1980), by failing to consider defendant's financial circumstances even after concluding he had established a substantial change in circumstances. For the reasons that follow, we vacate the court's orders and remand.

Given the extensive record of these proceedings, we detail only the relevant facts to provide context for our opinion. After approximately twenty-five years of marriage, plaintiff filed a complaint for divorce in January 2015. Following years of litigation, in October 2017 the court granted the parties a final judgment of divorce ("FJOD"), which incorporated a marital separation agreement ("MSA"). There is no dispute that throughout the marriage plaintiff was the supporting spouse and defendant was a full-time homemaker and primary caretaker to the parties' three children.

A-2599-23

The MSA required plaintiff to pay defendant limited duration alimony in the amount of $21,500 per month for ten years, followed by $15,000 per month for three more years in lieu of child support, whereupon plaintiff's alimony obligation would terminate. The MSA also detailed three circumstances in which alimony would terminate: (1) plaintiff's death; (2) defendant's death; or (3) defendant's remarriage.

Relevant to the issues on appeal, paragraph 3.2 of the MSA addressed the parties' financial circumstances at the time of their agreement:

> 3.2 Lepis/Crews Basis: The circumstances which existed as of this [a]greement are that [plaintiff] had been earning reported taxable income in the range of $350,000 to $450,000 during 2010-2012 which changed substantially post-separation when a merger with Meridian Health Systems took place and [plaintiff's] income increased to approximately $600,000 [i]n 2014, with a projected gross income increasing to approximately $700,000 in 2015. This new business venture with Meridian has the potential to provide [plaintiff] with significant income going forward, but there are also risks involved in the fitness industry which could adversely impact upon the business venture with Meridian, and as a consequence, adversely impact upon [plaintiff's] income. [Defendant] has been out of the job market and a full time homemaker since approximately 1995. Both parties are college graduates, [defendant] having a [master's d]egree.

3

Approximately one year after they executed the MSA, the parties executed to an addendum, in which they agreed "to eliminate the remarriage of [defendant] as a condition for termination of alimony." It further, provided that, "[t]his modification shall in no way limit [plaintiff's] right to seek a modification or termination of alimony in the event of a change of his circumstances in accordance with current statutory and case law standards."

Within two years after the entry of the FJOD, plaintiff informed defendant via their respective counsel that "a substantial change in circumstances ha[d] occurred regarding [his] income," warranting an adjustment in the amount of alimony he was paying to defendant. At the time, plaintiff owned several gyms and claimed to have fallen behind in his payments. At the start of the COVID-19 pandemic in March 2020, plaintiff again informed defendant that the closure of his gyms worsened his financial situation and that he would no longer be able to continue making alimony payments.[1]

Defendant moved, pursuant to Rule 1:10-3, to enforce the alimony and equitable distribution provisions of the MSA. In response, plaintiff cross-moved

---

[1] In March 2020, Governor Murphy issues Executive Order 107, requiring "non-essential" businesses, including gyms, remain "close[d] to the public" for as long as the order remained in effect. Exec. Order No. 107 (Mar. 21, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf

A-2599-23

for termination or modification of his alimony obligation and suspension of his equitable distribution payments.

In its initial June 1, 2020 order, the court granted defendant's motion to enforce her rights to alimony and equitable distribution and ordered plaintiff to pay defendant $26,354.84 in pro-rated alimony and support arrears that had accrued from the date he last made a payment until May 7, the date he filed his cross-motion.  With respect to the equitable distribution payments, the court concluded plaintiff was required to "pay in full $21,890.64, the total equitable distribution arrears that ha[d] accrued since the date [p]laintiff last made an equitable distribution payment," and denied plaintiff's cross-motion to suspend equitable distribution payments.

The court referred plaintiff's cross-motion for modification of his alimony and support obligations to mediation pursuant to Rule 5:5-6, and ordered plaintiff to produce the following documents by June 1, 2020:  "2019 [f]inancial [s]tatements and tax returns for the closely held entities in which [p]laintiff maintains an ownership interest"; earnings records from plaintiff's service on the OceanFirst Financial Corporation's ("OFFC") board of directors for the years 2019 and 2020; payroll data for 2019 and 2020; "2019 and 2020 statements of financial assets held by [p]laintiff"; plaintiff's 2019 financial records, including

the records from all of his closely held entities; and "[a]ny other records and documentation that would provide information for [defendant's] expert . . . to analyze [p]laintiff's pretax cash flow for the year end[ing] December 31, 2019[,] and the first quarter of 2020."

When mediation proved unsuccessful, the court conducted oral arguments on the motion and cross-motion. Following these arguments, the court found plaintiff had "proven a prima faci[e] case of a substantial change in circumstances warranting [the court] to conduct a plenary hearing regarding the issues raised in this case involving the amount of alimony." The court also granted plaintiff's request for defendant to provide a case information statement and her joint marital tax returns. The court, however, explained it would "stay [that] portion of [its order] pending . . . defendant's appeal." It also denied without prejudice defendant's cross-motion to sequester plaintiff's assets and denied without prejudice plaintiff's motions to reduce his alimony obligation and eliminate all accrued arrears pending the plenary hearing.

Further motion practice ensued, and on April 15, 2021 the court: (1) denied defendant's application to defer disposition of the issues; (2) granted defendant's motion "to continue without prejudice payments of $1,600 per month"; (3) granted plaintiff's application to require discovery; (4) granted

plaintiff's application for the parties to attend another round of mediation; and (5) denied both parties' motions for counsel fees.

On October 2, 2022, plaintiff filed another motion, this time seeking an order requiring defendant to produce various financial documents. Defendant cross-moved for a protective order. The court heard oral arguments on November 18, 2022 and subsequently granted plaintiff's motion to compel, denied defendant's cross-motion, and entered a conforming order that same day.

Defendant argued plaintiff was not entitled to any of her financial documents because the addendum to the parties' MSA provided "that any modification is about a change of [plaintiff's] circumstances." The court rejected defendant's argument, explaining that:

> If I find a change in circumstances . . . that's just one analysis. I, then, have to apply the factors of . . . the statute. I don't agree with [defendant's counsel] that it stops there. There's nothing here that says that's the only basis that I can . . . terminate or amend the alimony. It says . . . "[t]his modification shall in no way limit husband's right to seek a modification or termination of alimony in the event of a change of his circumstances in accordance with current statutory and case law standards."

In anticipation of the plenary hearing, the court bifurcated the issues as follows: (1) whether plaintiff had experienced a substantial change in circumstances during the years 2020 through 2022 that required a retroactive

7

modification of plaintiff's alimony and arrears obligations; and (2) whether plaintiff had demonstrated a change in circumstances from 2023 onward. The court found plaintiff had established a prima facie case of a substantial change in circumstances, prompting the court to conduct a plenary hearing.

The court conducted a plenary hearing over the course of twelve days, in which it heard testimony from plaintiff, defendant's financial expert Gregory Cowhey, and plaintiff's financial expert Michael Saccomanno, CPA. The court first explained defendant's financial circumstances would only "come[] into play if [plaintiff] can establish a substantial change of circumstances."[2]

Plaintiff testified he had entered the fitness industry in 1991 after leaving active-duty service in the Navy. He further testified he initially "operated three fitness centers, a small one in Mays Landing, one in Northfield that [he] owned [fifty-]percent of, one in Galloway, and then one in Ocean County that [he] owned a third of with Meridian at that time." He further explained in 2015 or 2016 Hackensack-Meridian Health ("Hackensack-Meridian") bought half of his clubs and he purchased half of their fitness clubs and as a result of this deal, he

---

[2] As to this point, "[the court] saw this as a gateway issue because if [plaintiff] does not establish a substantial change in circumstances, then [it would not] get to the issue of [defendant's] financial circumstances and that testimony would be irrelevant."

A-2599-23

operated eight clubs, with $120,000 of income per club, until the revenue associated with his businesses "ceased to exist" when the Governor ordered all gyms to shut down in response to the COVID-19 pandemic.

The record contains substantial testimony regarding plaintiff's finances. Plaintiff testified regarding the value of his several bank accounts, including his Charles Schwab investment and retirement accounts on direct and cross-examination. He acknowledged various bank and investment statements that showed fluctuations in the value of his various Charles Schwab accounts, including one account that showed an increase from $868 in 2020 to $94,396 in 2021 and $234,216 as of October 2022; another investment account that showed a decrease from $360,082 in 2020 to $196,775 as of October 2022; an IRA account with $951,776 in January 2020, which had decreased to $951,742 in October 2022; and another IRA account with $76,252 in January 2020 which increased to $115,252 as of October 2022.

Plaintiff agreed that the overall balances in those accounts increased from $1,388,000 in 2020 to $1,497,966 as of October 2022. He further explained that he had transferred approximately $1,850,000 between 2020 and 2022 from his Charles Schawb accounts into two PNC checking accounts and wrote checks or made other deductions from those funds. And, as to his Charles Schwab

accounts, plaintiff explained they were "funded since March of 2020 exclusively with [his] Ocean[3] asset distribution and the deferred comp[ensation] distribution."

Plaintiff acknowledged "total assets of $4,668,230[,] and total liabilities of $4,875,000," giving him a negative net worth of $206,770. He agreed that he listed his fifty-percent ownership share in Tilton Vista, LLC ("Tilton") as $2,000,000, even though Tilton lost most of its tenants in August 2020 due to the COVID-19 pandemic and had a $7,000,000 mortgage; of which he was liable for $3,500,000.

Plaintiff also testified he retired from OFFC's Board in March 2020, two months before the governance committee was expected to vote not to renew his position, and at the time of his retirement, he had approximately $111,000 of deferred OFFC compensation remaining. He next commenced employment as the CEO for Habitat for Humanity in Pensacola, Florida, earning $100,000 annually prior to receiving a raise to $150,000 and was receiving a monthly pension of $4,000 from the Navy.

---

[3] During plaintiff's testimony he references "Ocean assets" and "Ocean funds" with regard to Ocean City Home Bank and its successor OceanFirst Bank, an OFFC holding, which merged on November 30, 2016 prior to the parties' final judgment of divorce and MSA entered on October 13, 2017.

Defendant presented the testimony of her financial expert, Cowhey, who testified in detail regarding plaintiff's various accounts, "focusing in on cash flow from day one, not taxable income." Cowhey explained plaintiff's PNC account (ending in no. 1393) received deposits of $660,809 in 2020; $447,372.25 in 2021; and $342,062.27 in 2022 and another account (ending in no. 0212) showed deposits of $377,500 in 2020; $60.50 in 2021; and $24,871.21 in 2022, for a total of $402,431.71 during the 36-month period. He opined that plaintiff had deposited $1,852,674.58 into his PNC accounts in the three-year period from 2020 to 2023.

As to plaintiff's Charles Schwab accounts, Cowhey explained there was growth in at least one account of approximately $871,000, of which plaintiff cashed out $802,000 between 2020 and 2022. Nevertheless, Cowhey noted the account balance grew by $68,604. He further concluded that based on his analysis, between May 2020 and January 2023, plaintiff owed defendant $653,445 in alimony arrearages. Cowhey also disputed plaintiff's claim of negative equity in Tilton and he opined that based on Tilton's 2021 tax returns, plaintiff had approximately $1,500,000 in equity. Cowhey estimated plaintiff had a positive net worth of $3,102,000, contrary to plaintiff's assertion he had a negative net worth of $841,000.

11

Plaintiff also sought to present testimony from Samantha Roessler, a real estate appraiser, to offer evidence regarding the value of the Tilton's building in Galloway. Defendant moved to bar Roessler's testimony and her report based on plaintiff's belated submission. In denying plaintiff's application, the court noted plaintiff proffered this expert and her report "after five days of trial [and] after starting this trial ten months ago."

Plaintiff next called Saccomanno as his expert in forensic analysis and accounting. Saccomanno testified he used a cash flow analysis to calculate plaintiff's income over the three year period because "[w]hen you're dealing with a self-employed individual, you can't just look at the tax return. . . . [S]o we looked at the tax return, his business tax returns, the income that flowed from those tax returns, and then the actual distributions received." Saccomanno testified that in 2020, plaintiff received $20,890 in W-2 income; $50,000 from Tilton Fitness Management, LLC; $19,547 in unemployment compensation; $32,917 in pension income; a $10,000 distribution from Tilton; $17,464 in dividend income from his Charles Schwab accounts; $152,672 from "O[F]FC stock option exercise"; and $84,658 from "[v]ested O[F]FC shares." He calculated plaintiff's gross income for 2020 to be $249,385. According to Saccomanno, the $152,672 from "O[F]FC stock option exercise" was distributed

A-2599-23

to defendant as part of her equitable distribution payments. Accordingly, Saccomanno did not believe those assets should be considered in determining plaintiff's ability to pay.

Saccomanno calculated plaintiff's 2021 income using approximately $142,000 from his W-2 and $33,465 from his pension, which Saccomanno "backed . . . out as the pension was already distributed and [defendant] received her share of that pension"; $1 in interest income and $20,336 in dividend income from two non-retirement Charles Schwab accounts; $88,997 in deferred compensation that defendant also received; and $29,164 in deferred compensation. He calculated plaintiff's gross income for 2021 at $177,896.

Saccomanno estimated plaintiff's 2022 gross income was $194,440: $150,000 in W-2 income; $33,854 in pension income, which Saccomanno again "backed out" of his calculation; $29,813 in dividend income from his two non-retirement Charles Schwab accounts; $88,997 in deferred compensation from OFFC which he "backed out"; $29,345 in deferred compensation; and $36,282 from ACY Fitness. He explained plaintiff's account balances in his two non-retirement Charles Schwab accounts increased from $249,689 in March 2020 to $688,811 in June 2020 "due to liquidation of [plaintiff's] deferred [OFFC] . . . asset holdings." He disagreed with Cowhey's analysis of plaintiff's Charles

Schwab accounts in two areas explaining that Cowhey's analysis "include[d] all four accounts and . . . he [did] not indicate . . . if it's a retirement account and/or an investment account."  Second, Saccomanno believed Cowhey's analysis gave "an inaccurate picture of the economic reality of [plaintiff] because there are [OFFC] deferred holdings account that feeds into his entire asset picture . . . [and plaintiff's] assets decreased and . . . Cowhey [was] indicating that his assets increased."

On cross-examination, however, Saccomanno acknowledged the stock options plaintiff received from [OFFC] were not included in the parties' MSA and the balance in plaintiff's four Charles Schwab accounts grew by $68,604 between 2020 and 2022, despite plaintiff making $802,150 in withdrawals. Thus, both parties' experts agreed with respect to the increase in assets contained in plaintiff's Schwab accounts.

Following the plenary hearing, the court issued a 111-page written opinion and accompanying order:  enforcing plaintiff's alimony arrears obligation, plus 2% compounded interest per annum, in the amount of $657,433.48; freezing and sequestering all of plaintiff's Charles Schwab accounts until further order of the court; denying plaintiff's application for a termination or reduction of his alimony arrears obligation for 2020, 2021, and 2022; denying plaintiff request

to reduce his life insurance obligation, without prejudice; granting defendant's request for attorneys' fees, hard costs, and expert fees subject to oral argument on the issue of counsel and expert fees, which was scheduled for April 11, 2024.[4]

The court began its decision by stating, "pursuant to Lepis . . . defendant had submitted sufficient evidence to require a plenary hearing on the issue of whether or not the plaintiff had sustained a substantial change in circumstances so as to require this court to either terminate or reduce his alimony obligation as set forth in the parties' [MSA]." The court noted that the amount of alimony arrears (without interest) was not in dispute, however, the parties and their experts disagreed on the second part of the analysis: whether or not the court should terminate or reduce plaintiff's alimony obligation and if plaintiff has the ability to pay during 2020, 2021 and 2022. The court further also stated, it decided that the best approach was to "bifurcate the issues of the trial" as previously noted.

Of the three witnesses who testified, the court found plaintiff marginally credible, stating he "was a believable witness on some issues and not believable

---

[4] The court issued two amended orders as follows: a March 19, amended order for judgment; and an April 11, order clarifying the exhibits that were not entered into evidence, including D-3 through D-15, D-36 through D-38, and D-45 and D-57. The court noted that the exhibits did not affect its analysis or decision.

A-2599-23

on others." More particularly, the court found that plaintiff at times delayed in responding as though searching for the "right" answer, creating the impression that his testimony was less spontaneous and more rehearsed, and that on several occasions he went beyond the scope of the questions to inject additional commentary expressing his views on the litigation and asserting that he had been financially devastated by the closure of his businesses, the pandemic, and related issues.

As to Cowhey, the court found him to be a believable witness and noted that he provided "a very detailed analysis of the financial documents which was supported by the evidence." And, as to Saccomanno, who testified as plaintiff's forensic accounting expert, the court found, he offered believable testimony as it related to "some" of the plaintiff's financial status but when pressed, "was forced to admit that his opinions were unsupported by the evidence." The court reasoned that Saccomanno's credibility is a "mixed bag" because he would not concede the most obvious points until he was pressed repeatedly by opposing counsel.

The court next summarized plaintiff's testimony regarding his pre-COVID-19 pandemic assets, liabilities, and distributions made under the MSA, the closure of his gyms during the pandemic, and the fact that plaintiff could not

find comparable employment in the fitness industry and switched careers to become CEO of Habitat for Humanity. During this time, the court noted plaintiff made several financial decisions that impacted his ability to pay alimony.

On April 11, 2024, the court held oral argument to address defendant's request for attorney's and expert fees. The court found that Cowhey's fees of $214,375, over a four-year period, were reasonable. With respect to defendant's request for attorney's fees, the court explained it would not award costs for pre-litigation work and awarded counsel fees in the amount of $325,000,[5] and entered a corresponding order dated April 16, 2024. Plaintiff appealed.

## II.

"Our review of a Family Part judge's findings is limited, . . . 'afford[ing] substantial deference to the Family Part's findings of fact because of that court's special expertise in family matters.'" Voynick v. Voynick, 481 N.J. Super. 207, 220-21 (App. Div. 2025) (quoting W.M. v. D.G., 467 N.J. Super. 216, 229 (App. Div. 2021)). We defer to factual findings "supported by adequate, substantial, credible evidence" in the record. Gnall v. Gnall, 222 N.J. 414, 428 (2015) (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "Reversal is warranted only

---

[5] The court also denied plaintiff's request for a stay of its order enforcing plaintiff's alimony obligation and ordering the payment of arrears.

A-2599-23

when . . . the trial court's factual findings are 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" Reese v. Weis, 430 N.J. Super. 552, 567 (App. Div. 2013) (alteration in original) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "We apply that deference to a Family Part judge's decision regarding a motion to amend a marital-support obligation." Voynick, 481 N.J. Super. at 221 (citing Cardali v. Cardali, 255 N.J. 85, 107 (2023)). "Thus, a Family Part judge's decision regarding a support obligation should not be disturbed unless 'the court made findings inconsistent with the evidence or unsupported by the record or erred as a matter of law.'" Voynick, 481 N.J. Super. at 221 (quoting Reese v. Weis, 430 N.J. Super. 552, 572 (App. Div. 2013)). Conversely, we review questions of law and the Family Part's legal rulings de novo. Amzler v. Amzler, 463 N.J. Super. 187, 197 (App. Div. 2020).

An "award of counsel fees and costs in a matrimonial action rests in the discretion of the trial court." Guglielmo v. Guglielmo, 253 N.J. Super. 531, 544-45 (App. Div. 1992). We will disturb a counsel fee decision "only on the 'rarest occasion,'" Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)), and, even then, only on "an abuse of discretion involving a clear error in judgment." Tannen v. Tannen,

416 N.J. Super. 248, 285 (App. Div. 2010). Stated differently, we will intervene only when a trial judge's determination of fees is based on "irrelevant or inappropriate factors" and is "not premised upon consideration of all relevant factors." Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005) (citing Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

A.

Before us, plaintiff maintains the court erred by not following the requirements of Lepis and by bifurcating the matter into two stages: 2020 through 2022 and thereafter. Plaintiff asserts the court properly found he had "proven a prima facie case of a substantial change in circumstances warranting a plenary hearing," yet failed to follow the procedures outlined in Lepis by: failing to allow the exploration of defendant's financial status, and thus, made an "uniformed determination as to what, in light of all of the circumstances, is fair and equitable." Plaintiff maintains the court did not do what it said it would and never ordered defendant to provide her financial information, despite knowing that defendant's finances were substantial. Simply put, plaintiff maintains "[c]hange circumstances require a judge to examine both of the parties['] current situation and the situation when the order was entered."

19

Defendant maintains the decision "whether an alimony obligation should be modified based upon a claim of changed circumstances rests within a Family Part judge's sound discretion," based on their experience as applied to all the relevant circumstances presented. And, relying on Rova Farms, defendant maintains, we are to accord deference to the court's factual and legal conclusions, unless they are so manifestly unsupported by or inconsistent with the competent, relevant, and reasonably credible evidence as to offend the interest of justice. 65 N.J. 474, 484 (1974).

We note that from the onset, the court explained that it had determined that defendant's financial circumstances would "come into play" only if plaintiff established a substantial change in his circumstances. The court explained that it took this view because of the parties' amendment to their MSA in an addendum, which provided that with respect to alimony, the parties agreed "to eliminate the remarriage of [defendant] as a condition for termination of alimony. This modification shall in no way limit [plaintiff's] right to seek a modification or termination of alimony in the event of a change of _his_ circumstances in accordance with the current statutory and case law standards." (Emphasis in original).

N.J.S.A. 2A:34-23 authorizes the Family Part to modify alimony and child support awards when circumstances warrant. See Spangenberg v. Kolakowski, 442 N.J. Super. 529, 535 (App. Div. 2015). The statute expressly provides that support orders "may be revised and altered by the court from time to time as circumstances may require." N.J.S.A. 2A:34-23. Our courts have long interpreted this language to require a party seeking a modification to demonstrate "changed circumstances." Spangenberg, 442 N.J. Super. at 536 (alteration in original) (quoting Lepis, 83 N.J. at 157).

Once a movant establishes a prima facie showing of changed circumstances, the court may order discovery and, if material facts remain in dispute, conduct a plenary hearing to determine whether changes in the parties' needs or abilities to pay justify modification or termination of support. Miller v. Miller, 160 N.J. 408, 420 (1999). Further, courts have recognized several circumstances that may satisfy this prima facie threshold, including an "increase or decrease in the supporting spouse's income," Lepis, 83 N.J. at 151, and the maturation of a child and resulting changes in needs, J.B. v. W.B., 215 N.J. 305, 313 (2013). Additionally, in assessing whether changed circumstances exist, the court must compare the parties' current financial circumstances to those that existed at the time the support obligation was last fixed. Beck v. Beck, 239 N.J.

Super. 183, 190 (App. Div. 1990). This inquiry is not confined to circumstances contemplated at the time of divorce but rather focuses on whether the change is continuing and whether the agreement or judgment accounted for that change. Deegan v. Deegan, 254 N.J. Super. 350, 354-55 (App. Div. 1992) (quoting Lepis, 83 N.J. at 152). The same principles govern both termination and modification of support obligations. Voynick, 481 N.J. Super. at 223.

It is also well-settled that parties may include an anti-Lepis clause in a MSA reasonably limiting the circumstances that could qualify as a change in circumstances sufficient to modify an alimony obligation. Quinn v. Quinn, 225 N.J. 34, 49-50 (2016). We have previously determined that such anti-Lepis clauses do not offend public policy and are enforceable so long as they are entered into "with [the] full knowledge" of both impacted parties. Morris v. Morris, 263 N.J. Super. 237, 241 (App. Div. 1993). An anti-Lepis clause, however, must clearly state that the change-of-circumstances standard does not apply, or detail how the parties intend to handle modification of alimony requests. See, e.g., Morris, 263 N.J. Super. at 240 ("The parties hereby waive their rights for modification based upon changed circumstances as set forth in the case of Lepis."). This is because, parties who "bargain for a fixed payment or establish [their own] criteria for payment to the dependent spouse," must have

"full knowledge" of their departure from the <u>Lepis</u> modification standard, as courts do not otherwise read an anti-<u>Lepis</u> clauses into MSAs. <u>Id.</u> at 241.

Here, it is undisputed that after finding plaintiff had established a substantial change in his finances, the court nevertheless did not require defendant to provide her financial records for analysis. Rather, the court determined that based on the evidence adduced at trial and notwithstanding plaintiff's reduction in income from 2020 through 2022, plaintiff had the financial ability to pay his alimony arrears and meet his ongoing alimony obligation.

Under these circumstances, we conclude the court misapplied the <u>Lepis</u> framework and, in doing so, erred as a matter of law. We reach this conclusion based on our de novo review of the record. We note the court had an extensive twelve-day hearing and authored a comprehensive and detailed opinion based on its review of extensive financial testimonial and documentary evidence. We are, however, convinced that having found plaintiff had established a prima facie showing of sufficient changed circumstances, the court erred when it declined to consider defendant's financial circumstances, deeming them "irrelevant" based on its interpretation of the language in the parties' addendum to the MSA, which the court found akin to a "hybrid anti-<u>Lepis</u> provision."

23

We are satisfied that nothing in the addendum expressly modifies plaintiff's right to seek a modification of alimony pursuant to Lepis.  In fact, the language in the addendum solely eliminates defendant's remarriage as a condition of termination of plaintiff's alimony obligation while expressly maintaining plaintiff's right to seek a modification or termination of alimony in the event of a change of his circumstances "in accordance with current statutory and case law standards," which necessarily includes an evaluation of both parties' financial circumstances once a prima facie change has been shown.  See Beck, 239 N.J. Super. at 190; N.J.S.A. 2A:34-23(k).

Moreover, we are not persuaded by defendant's emphasis on the use of the word "his" in paragraph two of the addendum—limiting plaintiff's ability to seek a modification or termination of alimony in the event of "his" circumstances. We are unpersuaded that the use of the word "his" in this context should be interpreted to encompass only plaintiff's financial circumstances, as that interpretation ignores the remainder of the sentence, which specifically requires consideration "in accordance with current statutory and case law standards."

Additionally, we review MSAs by applying basic contract principles and, therefore, strive to discern and implement the parties' intent.  J.B., 215 N.J. at 326.  When interpreting an MSA, "[t]he court's role is to consider what is written

24

in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the 'expressed general purpose.'" Pacifico v. Pacifico, 190 N.J. 258, 266 (2007) (quoting Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 302 (1953)).

Guided by these principles, we are satisfied the court erred in construing the addendum as an anti-Lepis provision, eliminating from consideration defendant's income. Moreover, we note that although this may not have been the court's original intent—based on its own prior statements—it ultimately made its ruling without consideration of defendant's income, which constitutes error.

B.

Plaintiff further argues the court erred by including in its calculations of his income money from his Ocean fund, which he maintains was previously distributed under the MSA and is "an asset – not income or 'cashflow,'" which he used to satisfy his alimony obligation. Defendant concedes that "[a]n asset which was equitably distributed may not thereafter be considered in an alimony calculation." Innes v. Innes, 117 N.J. 496, 504-05 (1990); see also Miller v. Miller, 160 N.J. 408, 422 (1999). However, defendant additionally asserts, "where a 'contumacious' obligor fails to pay alimony, the obligor's equitably

25

distributed assets can and should be used as a fund to satisfy an alimony obligation." See Slayton v. Slayton, 250 N.J. Super. 47, 50-51 (App. Div. 1991). Defendant maintains "the [c]ourt correctly considered [p]laintiff's equitably distributed assets, which can be tapped as a fund to satisfy a legitimate alimony obligation."

On this point, the court found it is "mandated by Slayton to consider all of the plaintiff's assets in analyzing his ability to pay his alimony obligation, including those assets already equitably distributed," and concluded "plaintiff had sufficient assets to satisfy his alimony obligation during the years 2020, 2021 and 2022 based on Mr. Cowhey's appropriate and in-depth case flow analysis."

Having considered the record and applicable legal principles, we reject plaintiff's contention the court should not have considered his Ocean assets as income because he was only able to satisfy his alimony and equitable distribution obligations through the depletion of those assets. It is well-established that a supporting spouse's property, and capital assets are proper considerations in determining their ability to pay in the context of an application to modify or terminate alimony. Innes, 117 N.J. at 503 (quoting Bonanno, 4 N.J. at 275).

26

Here, the OFFC payments plaintiff received after his departure from that board are a form of deferred compensation from stock options. Pascale v. Pascale, 140 N.J. 583, 611 (1995). Thus, the court properly included this income in calculating plaintiff's ability to pay his arrears and alimony obligation. See Miller, 160 N.J. at 422 (recognizing that a supporting spouse's assets may be considered when calculating alimony). The court, however, failed to complete its own analysis and show its calculation to support its finding plaintiff has the financial ability to satisfy the arrears and pay his alimony obligation.[6]

---

[6] Moreover, with respect to the OCHB stock options plaintiff received in 2010, the court also found that none of "the $257,551.49 received by [plaintiff] as a result of his exercise of 2010 options in 2020" were included in the parties MSA. This was incorrect as paragraph 4.8 of the MSA expressly addressed the distribution of OCHB stock to defendant, accounting for the period between when plaintiff exercised his options and the day before the MSA was executed, stating:

> [Plaintiff] is the owner of stock in [OCHB] with an approximate value of $430,000. Included in this stock are shares recently purchased by [plaintiff] when he exercised options using funds borrowed from his father in the amount of $250,000. [Plaintiff] shall pay to [defendant] a sum equal to one-half of the difference between the current market value of these shares as of March 31, 2016 and the $250,000 loan owed to his father for [defendant's] interest in these shares, within 30 days of April 1, 2016 the execution of this [MSA].

C.

Finally, we address plaintiff's argument the court erred in prohibiting him from presenting Roessler's expert report and testimony at trial warrants reversal. "[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). Therefore, we review a trial court's "[e]videntiary decisions . . . under [an] abuse of discretion standard." Id. at 383-84. An abuse of discretion arises when the court's "decision [was] made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." United States ex rel. U.S. Dep't of Agric. v. Scurry, 193 N.J. 492, 504 (2008) (alteration in original) (quoting Flagg, 171 N.J. at 571).

We reject plaintiff's assertion the court abused its discretion and that reversal is warranted on this basis. Because Roessler's statements constituted an expert opinion, plaintiff was required to identify and disclose this expert either: (1) in its response to defendant's interrogatory requests on or before "[twenty] days prior to the end of the discovery period," R. 4:17-7; see also R. 4:10-2(d)(1); R. 4:17-4(a), or (2) less than "[twenty] days prior to" the conclusion of discovery, "only" upon a motion to amend its responses

accompanied by a certification stating "the information requiring the amendment was not reasonably available or discoverable by the exercise of due diligence prior to the discovery end date," R. 4:17-7. Moreover, "[i]n the absence of [a] certification, [a] late amendment shall be disregarded by the court and adverse parties." Ibid. Where a party fails to disclose an expert's report pursuant to Rule 4:17-4(a) but attempts to introduce the expert's testimony at trial, "[t]he court . . . may exclude the testimony." R. 4:23-5(b); see also DePalma v. Bldg. Inspection Underwriters, 350 N.J. Super. 195, 216 (App. Div. 2002) (upholding a court's exclusion of an expert's testimony where the offering party did "not name[] the [expert] or provide[] his report during the discovery period, and its belated attempt to call [the expert] to offer a legal opinion, and to introduce [new information,] . . . came as a surprise during the trial.").

Here, there is no dispute plaintiff failed to identify Roessler as an expert prior to the conclusion of discovery and did he move to amend his discovery responses. Instead, as the court explained, plaintiff simply "c[a]me to . . . court ten months into trial and tr[ied] to introduce new evidence after . . . Cowhey's testimony ha[d] been completed[ and] after . . . defendant's case in chief ha[d] been completed." Against this backdrop, we observe no abuse of discretion by

the court in denying plaintiff's belated attempt to introduce Roessler as an expert.

In sum, we vacate the court's orders granting defendant's application to enforce the MSA and for payment of arrears, denying plaintiff's cross-motion for modification or termination of alimony, and granting defendant's attorney's costs and fees. On remand, a different judge shall determine what discovery defendant must provide to plaintiff to determine the parties' respective financial circumstances pursuant to Lepis, and conduct a new or supplemental plenary hearing, as needed to address any outstanding issues. We reach this conclusion because this judge previously made credibility findings, and thus, it is "appropriate that the matter be assigned to a different trial court." R.L. v. Voytac, 199 N.J. 285, 306 (2009). We further note that, we have no quarrel with the court's determination to bifurcate the issues for trial or its denial of plaintiff's motion to call Roessler as an expert. In light of our decision to order a new hearing, however, we leave it to the court's discretion to reconsider its decision with respect to Roessler's expert testimony. Nothing in our opinion should be interpreted as an expression of our view on the merits of the remanded proceedings.

A-2599-23

Vacated and remanded in accordance with this opinion, we do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2599-23